## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **RX SAFES, INC.** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **CAUSE NO.  2:16-cv-01095 (AKH)** |
| **KODIAK CAPITAL GROUP, LLC** | § | |
| **RYAN HODSON,** *individually,* | § | |
| **BMA SECURITIES, and ISLAND** | § | |
| **CAPITAL MANAGEMENT, LLC dba** | § | |
| **ISLAND STOCK TRANSFER,** | § | |
| | § | |
| *Defendants.* | § | |

## FIRST AMENDED COMPLAINT

## I.

## CASE SUMMARY

This lawsuit arises from a surprising confluence of events that, thanks to Defendants' wrongful actions in selling shares they had no right to obtain, has cost Rx Safes millions of dollars in damages. Defendant Kodiak Capital Group LLC ("Kodiak"), its president Ryan Hodson, and its broker-dealer partner BMA Securities embarked on a plan to purchase aged debt and convert it into RxSafes shares for a substantial profit. These Defendants induced RxSafes not to retire certain debt as RxSafes had planned to, promising that they would invest in Rx Safes, and sign "leak out" agreements governing the debt to avoid glutting the market with shares that contributed to a downward slide in the share price. RxSafes' transfer agent, IST—who is trustee of Rx Safes' shares—shockingly was a willing participant in this scheme. Not only did it convert the debt into shares that were not freely tradable under SEC Rule 144, it issued them to Kodiak who had not given Rx Safes notice (as required by contract) and was not even authorized to the demand those shares in the first place. IST knew it and breached its fiduciary obligations.

## II.

## PARTIES

1.      Plaintiff Rx Safes Inc. is a healthcare technology and medical device company incorporated under the laws of Nevada, with its principal place of business in the State of Nevada.

2.      Defendant Kodiak Capital Group, LLC, is an investment business with its principal place of business in the State of California. Upon information and belief, it's sole member, Ryan Hodson, is an individual residing in California and can be served via its corporate officer at 260 Newport Center Dr., Newport Beach, California 92660.

3.      Defendant Ryan Hodson is the principal of Kodiak Capital Group, LLC, and is an individual residing in and is a citizen of the State of California. Upon information and belief, he can be personally served at 260 Newport Center Dr., Newport Beach, California 92660.

4.      Defendant BMA Securities LLC is a business entity qualifying as a broker dealer under the Exchange Act, with its principal place of business in the State of California. Upon information and belief, its sole listed member, Burt Martin Arnold is a citizen of California. BMA Securities LLC can be served via registered agent Burt Martin Arnold, at 2321 Rosencrans Ave., Suite 3285, El Segundo, California 90245.

5.      Defendant Island Capital Management LLC *dba* Island Stock Transfer is a business entity with its principal place of business in the State of Florida. Upon information and belief, its sole listed members, Micah Eldred and Carl Dilley, are residents of the State of Florida. Island Stock Transfer can be served via registered agent Christine Zitman at its headquarters, 15500 Roosevelt Blvd., Suite 303, Clearwater, Florida 33760.

### III.

### JURISDICTION AND VENUE

6.      Personal jurisdiction is proper in this Court because each defendant regularly transacts business in the State of New York, the subject financial instrument is located in New York and has a choice of law and venue clause selecting New York, and defendants committed tortious activities that impacted the financial instrument in the State of New York and derive substantial revenue from interstate commerce and from New York specifically.

7.      Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1331 because Plaintiff has sued Kodiak Capital, BMA Securities, and Ryan Hodson under Section 10b of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and may assert supplemental jurisdiction over all other state claims  under 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over the parties under 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Nevada, and no other parties or their respective principals is a citizen of Nevada and the amount in controversy exceed $75,000 exclusive of pre- or post-judgment interest.

8.      Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of property that is the subject of the action is situated and under the terms of the agreements and financial instruments that are the subject of this lawsuit.

### IV.

### FACTUAL BACKGROUND

9.      On May 29, 2015, Rx Safes sold a 1-year convertible note carrying 8% interest, to LG Capital Funding, LLC., a New York investment firm, with a face value of $26,500, that allowed LG to convert the interest and principal of the note into Rx Safes Common Stock at a 35% discount to the prevailing market price of Rx Safes' common stock, according to a specified

look-back formula (the "LG Note").

10.     Under the prevailing laws, the LG Note had to be seasoned, or held without being converted into stock pursuant to its terms, for a minimum of six months before the underlying shares could become freely tradable under SEC Rule 144 of the Securities Exchange Act and sold without being registered.

11.     LG funded the note purchase on or about June 6, 2015, which triggered the start date of the holding period under SEC Rule 144.

12.     The LG Note required Rx Safes to set aside and reserve a sufficient number of shares to allow for proper effectuation of the conversion rights under the note's terms.

13.     Contemporaneous with the execution and funding of the LG Note, Rx Safes indeed sent a reservation letter to its transfer agent, Island Stock Transfer ("Island"), reserving 6,549,000 shares on or about May 29, 2015.[1]

14.     Contemporaneous with the execution and funding of the LG Note on June 6, 2015, Rx Safes additionally sent an irrevocable authorization to Island to permit it to effect any conversion demanded by LG in a manner consistent with the terms of the LG Note, whenever LG sent a conversion notice, and satisfied certain other conditions precedent.

15.     Both the reservation letter and the authorization letter specifically referenced the May 29, 2015 note that was issued to the Holder, LG – these were not general authorizations, either on the Note or the Holder. Thus, in order for a subsequent holder to step into LG's shoes, the assigned or sold Note would have to be presented first to Rx Safes and acknowledged, and any conversion would have to be sent to the Company.

16.     The LG Note permitted Rx Safes to prepay the Note and terminate the conversion feature if accomplished by December 6, 2015 (the "prepayment period"), after which, the Note

---

[1] This was prior to a 200 for 1 reverse stock split effectuated on October 12, 2015.

would become seasoned, would be fully convertible to shares which would be freely tradable, and Rx Safes would not be able to repay it or prevent the conversions.

17.     While Rx Safes had executed many convertible notes, it had a policy of paying off every convertible note that it had issued before the prepayment period expired, or alternatively negotiating an extension, leak out or limited conversion with the note holder—even if it had to pay off a little more than the interest via a prepayment penalty, in order to foreclose the redemption or conversion of shares which might otherwise affect its financing posture and stock float.

18.     LG did not attempt to convert the LG Note at any time it held the note.

### The October 7, 2015 Kodiak Note

19.      On October 7, 2015, Rx Safes and Kodiak separately executed a convertible note with principal value of $60,000 and 8% interest, that Kodiak paid $50,000 for on October 9, 2015 (the "OctoberNote").

20.     Contemporaneous with the funding of the October Kodiak Note, Rx Safes issued to Island Stock Transfer an irrevocable authorization for conversion of shares related to that Note, and also sent a reservation order reserving shares to satisfy the conversion demands of the October Note.

21.     Both the reservation letter and the authorization letter specifically referenced the October 7, 2015 note that was issued to Kodiak – these were not general authorizations for issuances or general reservations.

22.     Little did Rx Safes know at the time that this was just the beginning of an elaborate ruse to entice Rx Safes into reserving shares that would later be used to convert an unseasoned and wrongfully obtained LG Note.

**Kodiak Agrees to Invest an additional $100,000into Rx Safes and to sign a Leak Out Agreement, in Exchange for WhichRx Safes Agrees to Kodiak's Purchase of the LG Note**

23.     On or about October 7, 2015, Lorraine Yarde and Rx Safes met with Ryan Hodson of Kodiak in Nevada to discuss Rx Safes' desire for comprehensive funding. In exchange, Rx Safeswas willing to consider allowing Kodiak to buy aged convertible debt (namely, the LG Note) if Kodiak also signed a leak out agreement.

24.     The desire for aged debt was plainly a desire to get their hands on aged and seasoned convertible instruments that they knew guaranteed them an immediate profit once they converted to common shares at a discount to the market price and sold at the market price.

25.     On October 21, 2015, Lorraine Yarde, CEO of Rx Safesreceived an email from Ryan Hodson indicating his proposal of a combination deal of aged debt purchase with new money and $5,000 per day leak out of the converted shares from the aged debt because Mrs. Yarde expressed her concerns that Kodiak had a reputation for liquidating and driving the share price of companies down, without regard to the health and well-being of the company.

26.     That day, they had a telephone conversation regarding the aged debt and new money.  Hodson expressed an interest in having Kodiak purchase both the LG Note and another convertible note that had been issued to Auctus, that was aging in December 2015.

27.     Absent Rx Safes' agreement not to redeem the Note during the "prepayment" period, Kodiak would be unable to purchase any of the aged debt.

28.     Yarde determined she was only willing to allowKodiak to purchase the LGnote at the time and followed up with an email and reiterated the need for the leak out and asked how he (Ryan Hodson) wanted to handle that.

29.     On October 22, 2015, Hodson again emailed Yarde proposing that if Kodiak were allowed to purchase the LG Note and the Auctus note, Kodiak would be willing to invest new

money in Rx Safes (separately so from purchasing the aged debt) through an equity line of credit (an "ELOC") as well as a new money note.

30.     Yarde responded similarly, expressing interest in the proposal, but also insisting that any purchase of aged debt would be subject to a leak out agreement, to prevent anyone from simply swamping the market with Rx Safes' shares, thus driving down the market price of the stock.

31.     Over the next several weeks, Rx Safes and Kodiak discussed different iterations of the same terms – placing special emphasis on the need for (i) a leak out agreement if any aged debt were to be purchased, and (ii) that any deal would need to be closed to protect Rx Safes otherwise it would have to exercise its prepayment rights under the LG Note.

32.     During this time, the "new Money" was agreed to be approximately $100,000 -- $85,000 in investment and $15,000 to compensate Rx Safes for the costs of registering with certain OTC markets.

33.     About October 29, 2015, Hodson and Yarde agreed to terms that included new money invested in Rx Safes by Kodiak, Kodiak purchasing the aged debt subject to a leak out and Rule 13d holding restriction (9.99%), among other things. Kodiak confirmed that they would draw up the proper papers.

34.     On November 10, 2015, the papers having not been drawn up yet,Lorraine Yarde and Mark Basile, a director atRx Safes, expressed to the Kodiak players that Rx Safes had received a better offer, and thus, they would have to terminate the pending transaction, but that they would be, out of courtesy, willing to continue if the terms from Kodiak could be equally as good for Rx Safes as the other offer.

35.     Rx Safes followed the call up with email that day confirming their intent to

continue with Kodiak if Kodiak agreed to the following things:

> "A commitment to purchase up to $250,000 of aged debt, with timing as the 9.9% rule allows with a $5000 per day maximum trading value on such debt
>
> A new convertible note for $85,000, first $35k payable upon filing of the registration and the second to $25k tranches 30 and 60 days thereafter
>
> Pricing based on 5 trading days prior to put notice.
>
> Closing/Settlement 1 day after put notice – we are required to deliver shares the same day.
>
> No DWAC requirements.
>
> Put amounts based on 200% of a total of the average 3 highest trading days value over a 10 day prior trading period."

36.     On November 18, 2015, Kodiak responded via email stating they would agree to the following terms:

> "We can commit to purchasing up to $250k of aged debt using the 9.9% rule.
>
> We would agree to a leak out that is the greater of $5,000 per day or 20% of the ADV
>
> We can do the $85k note as described by you
>
> We will not agree to the pricing based on 5 trading days prior to put
>
> We will not agree to closing/settlement 1 day after put notice
>
> We are ok that you do not have DWAC
>
> There is no reason to base the put amounts on 200% of 3 trading days.  You can put whatever amount you want to us: for example, if you want to do a put for just $15,000 you can do it, it is up to you, so a formula and document re-write is not necessary
>
> That we are willing to accommodate almost every request/change you have requested shows we really want to work with RXSF for the long deal & we are the right partner to work with and make things profitable for us all."

37.     Based upon this promise, Rx Safes forwent its other opportunity and ceased

looking for other sources of funding that it would be able to use to pay off the $26,500 LG Note, and continued to engage with Kodiak.

38.     They signed preliminary agreements for an equity line of credit (the ELOC) that was designed to be part of a comprehensive funding which included a new money note, and purchases of up to $250,000 of aged debt, subject to the leak out agreement (which Kodiak and Hodson had agreed to the content of).

39.     On November 23, 2015, on a phone call with Kodiak's Ryan, Hodson, Jim Abbott, Rx Safes' Lorraine Yarde and Mark Basile agreed in principal to a deal whereby Kodiak would agree to fund $85,000 in new money and revise the terms of the letter of credit, in exchange Kodiak could buy the aged debt if they signed a leak out agreement.

40.     It was also made clear on that call and the next day, November 24, 2015 in an email from Lorraine Yarde, that time was of the essence because of the upcoming expiration of the prepayment option under the terms of the LG Note on December 6, 2015, and that they would need all features of the deal they were discussing.

**Kodiak Goes Radio Silent, Lies to Rx Safes, and Does a Fraudulent End-Run Around Rx Safes' Prepayment Rights in the LG Note**

41.     After several days of radio silence and no documents forthcoming, on November 29, 2015, Rx Safes' Mark Basile sent an email terminating the ELOC agreement based on the lack of communication or documents representing the comprehensive funding. They had initially agreed verbally to extend Rx Safes' time to file the S1 registration under the requirements of the ELOC but failed to sign the extension agreement providedthem by Rx Safes. The termination letter provided Kodiak the ability to extend the time to file in writing but they did not execute it.

42.     Rx Safes still had no intention of allowing the LG Note to go into conversion status "as is" without a leak out agreement or to allow any disorderly issuances of common stock

into the market.

43.    On December 1, 2015, Jim Abbott responded that they had granted an extension of the ELOC. Regardless, this still did not address the issue of the overall comprehensive funding plan, all parts of which were required to move forward. Rx Safes still needed all of the other documents for the new money, the agreed upon debt purchase and the corresponding leak out agreement to be executed (which were all relevant because the LG Note's prepayment period expired on December 6, 2015).

44.    Lorraine Yarde emailed Jim Abbott that same date to explain that due to the December 6, 2015 deadline, all paperwork would have to be done by then, once again, because of the LG Note's terms.

45.    Suspiciously, Ryan Hodson had suddenly disappeared from the conversation stream.

46.    The next day, December 2nd, 2015, Jim Abbott of Kodiakemailed Yarde and Basile, stating he had spoken to Ryan and that the documents (the contracts) would be sent over later that day. Lorraine Yarde replied stating that LG had to be taken care of to which Abbott responded that LG would be taken care of (but was silent as to the other documents). Abbottrequested contact information on LG and sought other detailed information.

47.    For the first time in what seemed like weeks, Hodson called Yarde at approximately 7:45 PM PST stating that he was about to call Jim Abbottto instruct him to send over purportedly signature-ready contracts within the next 30 minutes. However, nodocuments arrived.

48.    Yarde texted Ryan again around 11pm that night stating that she hadn't received anything, and that leaving things to the last minute was not going to work.Again, Hodson did not

respond to her.

49.     The next morning, on December 3, 2015, Yarde emailed Hodson expressing her concerns. He was silent. Jim Abbott texted Yarde stating that he had not heard from Hodson and was himself a bit concerned.

**The Fraudulent Scheme Is Executed**
**December 4, 2015**

50.     On December 4, 2015, out of the blue, Ryan Hodson sent an email to Lorraine Yarde with the subject line: "**Executed Docs.**"

51.     But the documents attached to the email—the leak out agreement, the note purchase schedule (but no agreement), and the ELOC extension agreement—were not executed by anyone at Kodiak. Believing he had simply made a mistake, Yarde responded informing him of his misattachment and to please send executed copies.

52.     Ryan followed up with an email to LG—but including Yarde and Basile—with the subject line "CLOSING DOCUMENTS." This had been sent to the incorrect LG email address, and Yarde forwarded it to the proper one believing this deal was as good as consummated.

53.     Relying on Hodson's subject line and believing that he intended to consummate the whole transaction as contemplated and agreed to, Yarde signed the leak out agreement and the ELOC extension agreement, and sent them to Ryan requesting his counter signature, and asking for the comprehensive debt purchase agreement, and the new Note.

54.     In reliance on the misrepresentation that the executed documents had been sent (or that the documents had been executed and just needed to be delivered), Yarde had previously sent Island Stock Transfer an authorization to convert and transfer shares under the LG Note to Kodiak as the new Holder of the LG Note (the "Substitution Letter").

55.     This authorization was subsequently revoked, Yarde indicated to Island that the Substitution Letter should be destroyed because Kodiak had not signed the required accompanying leak out agreement and Island acknowledged destroying the said Substitution Letter.

56.     Yarde emailed Kodiak again stating they still did not have the executed docs from them reflecting the comprehensive debt purchase commitment, leak out, extension of time for S1, and new note.  No answer came from Ryan Hodson, Jim Abbott, or anyone else at Kodiak.

57.     Rather than sending the requested documents to Yarde or Basile, Hodson instead simply executed the Note Purchase Agreement for the LG Note to LG's principal member, the executed Note Purchase Agreement was sent via email to LG and Kodiak subsequently wired LG the purchase price. The email did have a post-script to Lorraine Yarde stating he would connect with her shortly. He did not.

58.     Yarde again emailed Hodson stating that they still needed the leak out agreement signed, the debt purchase documents, the S1 extension letter signed and the note. Hodson never replied.

59.     After calling and texting Hodson, he finally instructed Yarde to "please call Jim."

60.     Yardecontacted Jim Abbott telling him that Ryan Hodson had told her to reach out to him to finalize the documents. Abbott responded that only Hodson could authorize the transaction and the wire-transfers.

61.     When Yarde responded that any wire was premature given the lack of final signatures and the lack of some documents, Abbott responded that the LG Note assignment was in place,which was the only thing needed was the wire.  She reiterated that without the entire transaction fully executed, then nothing was to happen.

62.     Abbott replied stating "buying LG should be the #1 priority I think, right?" to which Yarde responded: "Yes so we need the leak out signed but also need the new money docs".  Abbott responded: "Lets get LG done." To which Yarde explained: "Agreed but part of that is the leak out."

63.     Then, radio silence again.

64.     The next day [December 5, 2015], Lorraine emailed Kodiak asking whether the wire had indeed been sent, and where were they on the other documents. She heard nothing from anyone.

65.     On December 4, 2015, Yarde, sensing trouble, reached out to LG to inform them that, Kodiak appeared to have reneged on their agreement with Rx Safes, thatRx Safes intended to work something out to pay or extend the LG Note off and requesting a couple of days to put things together to accomplish that.

66.     But-for the long drawn-out inducement by Kodiak, Yarde would have—as she had so many times already—put together other financing options well before the deadline to pay the note off expired. As it stood, Rx Safes would now not be able to pay off the LG Note.

67.     Little did she know that the wire had indeed been sent to LG and LG, apparently under the misapprehension that the entire deal had gone through, executed the Note purchase agreement and transferred the LG Note to Kodiak.

68.     On December 7 2015, Yarde received a distressing phone call from Mr. Stanley Elbaum, the man who had originally introduced Kodiak to Rx Safes. He indicated he had a conversation with Jim Abbott, and that Abbott had stated that Kodiak had no intention, and never had an intention, of giving Rx Safes any new money.

69.     The entire series of negotiations, emails, texts, representations and agreements

had been an elaborate ruse.

70.     Yarde immediately emailed Abbott and Hodson, expressing her concerns, and reiterating again that they still have an effective termination in place for the ELOC and stated that if there was anymisunderstanding, she would need documents in place by close of business, and that she would not agree to anything unless they had everything in place—the new note, the leak out agreement, among other things.

71.     On December 8, 2015, Yarde re-sent the termination notice for the ELOC and expressed her distain in the way Kodiak had conducted themselves.

72.     At this time, and throughout the entire time the comprehensive funding was being discussedit was clearly Rx Safes' position that there was to be no debt purchase without the entire deal consummated.

73.     It was not until December 22, 2015, that Rx Safesonce again heard from Kodiak via their transfer agent Island Stock Transfer who communicated with the Company indicating that Kodiak was looking for information regarding Rx Safes' share structure. Yarde emailed Kodiak to express her shock and dismay, and asserted that Kodiak had attempted to fraudulently induce Rx Safes to allow them to purchase aged debt for immediate gain by their false promises to purchase up to $250,000 in aged debt, sign a leak out agreement limiting daily market sales to no greater than $5,000.00 a day, and fund a new note for $100,000.

74.     Yarde also noted that "Our transfer agent has informed us that you requested information pertaining to our outstanding and authorized shares.  I have informed them to have you contact me directly and have also informed them that they are not authorized to issue any shares to Kodiak for the underlying LG note.We have attempted to communicate with you over the last several weeks and you refuse to respond to us by phone or email.  Your failure to

consummate the overall agreed upon transaction documents, is in our opinion tantamount to fraud in the inducement with regard to the purchase of the LG note.If you wish to resolve this, I would suggest that you contact the Company directly so that the outstanding issues can be discussed."

**Island Stock Transfer Fails to Adhere to Either
Its Own Rules or its Fiduciary Responsibility**

75.     Rx Safes' stock transfer agent, Island Stock Transfer ("Island" or "IST"), is supposed to abide by the rules governing its role as an agent of Rx Safes, and as a fiduciary protecting Rx Safes' property—namely, its unissued shares and certain confidential and non-public information about the company.

76.     On December 4th based on Kodiak's failure to provide the executed leak out agreement relating to the sale shares pursuant to purchased aged debt, Yarde emailed IST informing them that any conversion of LG shares would only be permitted by Kodiak in conjunction with the accompanied Leak Out agreement, and Yarde attached the agreement to the email.

77.     On December 7thYarde emailed IST stating "*At this time I am not authorizing any assignment of reserve shares to Kodiak. They have failed to execute agreements with us. I will communicate with you again if this situation should change*". Island responded stating that they understood.

78.     Again on December 14th Yarde emailed IST stating "I would like to reiterate that the TA letter sent to you previously, relating to the assignment of reserve shares from LG to Kodiak was to be destroyed. No such authorization has been given by the Company and we will not approve any requests made by Kodiak to convert any of these such shares. Please acknowledge your receipt and understanding of this and please let me know immediately if you

should receive any such requests from Kodiak."

79.     IST replied to this email confirming their understanding that the letter was destroyed.

80.     On December 22nd Rx Safes received an email from IST asking for permission to release information on the shares outstanding and authorized in response to a request from Kodiak.  Yarde responded "At this time I do not want you to release any information to Ryan.  We have a dispute with Kodiak and I would request that you have him call me directly".

81.     IST once again acknowledged Yarde' response.

82.     Nothing more was heard of the Kodiak transaction and no communication was sent to Rx Safes from IST indicating that they had received any requests from Kodiak following the last request from them relating to share structure.

83.     On January 5, 2016 Rx Safes requested an updated shareholders list from IST and noticed that the total issued and outstanding shares had increased and asked for further clarification from IST.

84.     IST sent Yarde the recent transfer journal and it was upon review of this that Yarde became aware for the first time that IST had effectuated two conversions to Kodiak in the amount of 9,615 and 19,230 shares respectively – done without Kodiak ever having given the contractually required notice to Rx Safes of the conversion notices.

85.     Yarde immediately kicked into gear and called and emailed IST requesting Stop Resolutions be sent immediately and indicating to IST via telephone that these conversions should never have been allowed based on her previous indication of an adverse claim against Kodiak and that they had failed to abide by the Company's instructions relating to Kodiak.

86.     IST confirmed that the two certificates had not yet been converted into street

name as they were being held in favor of Kodiak until considered to be held "LONG" by the brokerand that Rx Safes would need to issue Stop Resolutions to prevent the further transfer of these shares.  Yarde immediately submitted Stop Resolutions for the two certificates issued to Kodiak

87.     Upon receipt of the Stop Resolutions Island claimed it would not further transfer these certificates and would respect a 30-day "Stop Order" period to allow Rx Safes time to properly oppose and substantiate its position.

88.     Kodiak's conversion notices contained legal opinion letters regarding the shares' compliance with Rule 144's exemption from registration under the Securities Acts.

89.     Rather than wait, against the explicit instruction of Rx Safes, and ignoring Rx Safes Stop Order, Island went ahead and effectuated the conversions and transfer.

90.     The trouble with the conversions were several-fold:

- Kodiak's conversion requests were not being sent to Rx Safes which facially violates the Note's terms (§ 3) to ensure notice to Rx Safes of any issuance.

- Rx Safes explicitly instructed IST prior to any conversion requests being made that it had an adverse claim against Kodiak and that they were NOT to allow any conversion by Kodiak and should inform Rx Safes if any such requests for conversion was made.

- Island had a fiduciary responsibility to abide by Rx Safes request but failed to do so in the first instance.

- Rx Safes informed IST that the LG Note violated New York's criminal usury law, NY Pen. Code § 190.04, and therefore, was void *ab initio*.

- Rx Safes instructed IST that the LG Note had been transferred via fraud.

- Rx Safes informed IST that the LG Note transfer had not been duly presented to Rx Safes and had not been acknowledged by Rx Safes, and thus, was not properly transferred under the Note and Stock Purchase Agreement.

- Rx Safes instructed IST that they were required to be notified by any party

looking to convert shares under the LG note, which they were not and this effectuated a default of the original LG note.

- Rx Safes informed IST that they had no authority to transfer shares reserved for LG under the LG Note, upon demand by Kodiak.

- The shares issued were not properly seasoned under Rule 144, that the Opinion Letter failed to properly review all consideration paid by Kodiak to purchase the Note and that in fact additional consideration had been paid above and beyond just principal and interest which would mean that the original Note when transferred would begin a whole new tacking period.

- In addition, Kodiak was allowed to convert interest shares which were not eligible to be converted under Rule 144.

- That the shares used to effectuate the conversions were not seasoned as they were taken from a pool of shares reserved under Kodiak's first note it held directly with the company, and that such shares were not aged and therefore not exempt underRule 144.

- That the shares of the company that were converted were intentionally converted by IST even thoughthe opinion letter of counsel wrongfully identified the shares to be converted, and as fiduciary, IST processed the conversions based on the faulty opinion letter of counsel.

91.   Over the next three weeks, Island proceeded to convert the LG Note upon Kodiak's conversion requests which contained Rule 144 legal opinions expressing that the shares met the Rule 144 requirements which they did not.

92.   Upon information and belief, Island issued Kodiak Rx Safes common stock that allowed Kodiak to make a profit at the expense of Rx Safes and its shareholders.

93.   Upon information and belief, Kodiak, via its broker dealer, BMA Securities, shorted Rx Safes' stock, or pre-sold the shares in violation of Rule 144, which also caused the market for Rx Safes to decline dramatically.

94.   The shares improperly converted and transferred to Kodiak by Island were then used to cover the shorts, or otherwise were "dumped" into the market by Kodiak (upon

information and belief), causing the market to decline precipitously in the days following the transfers in violation of the leak out terms agreed to in writing and verbally by Kodiak —thus doing substantial damage to Rx Safes' value (this is why the leak out agreement was so crucial) while reaping a windfall for Kodiak.

95.     The downward pressure on Rx Safes' stock price has indelibly damaged the company.

96.     Kodiak and BMA's trading activity injured Rx Safes to the tune of hundreds of thousands of dollars andcost in excess of $5 million in lost market value.

97.     Had Kodiak abided by the new money, aged debt purchase, and leak out agreement, the losses and damages to Rx Safes would not have occurred.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF RULE 10b-5
### Against Kodiak, BMA Securities, and Hodson

98.     Plaintiff Rx Safes incorporates the factual allegations set forth above as if fully set forth herein.

99.     Kodiak, Hodson and BMA Securities violated Rule 10b-5 ,17 USC § 240.10b-5's fraudulent scheme and artifice to defraud prohibitions.

100.     Hodson and Kodiak employed a scheme to defraud Rx Safes: step one was the confidence ruse of the October Kodiak Note to ingratiate themselves to Rx Safes and open discussions of purchasing more aged debt—the October Note raised Rx Safes' confidence level that Kodiak was a real partner.

101.     Kodiak abused this trust and confidence by using the repeated promises in

emailsduring the period of October and oral and written agreement to invest an additional $100,000 in Rx Safes and sign a leak out agreement if Rx Safes would sell it the LG Note and other aged debt, whilst Kodiak and Hodson had no intention at any time to fulfill their promise.

102.     Hodson and Kodiak employed an artifice to defraud Rx Safes in the form of at least two emails – the first evincing a willingness to do a complete transaction whereby it would invest new money in Rx Safes, purchase $250,000 in aged debt including the LG Note and execute a leakout agreementon which Rx Safes relied in not pursuing other avenues; and a second claiming to be the executed documents on December 4, 2015, on which Rx Safes relied in not directly paying off the LG Note while it figured out what was going on with Kodiak, and on which it relied in sending its authorizations to Island, and on which LG relied in selling the LG Note to Kodiak.

103.     Hodson and Kodiak made these affirmative representations verbally and via email to Rx Safes' Lorraine Yarde and or Mark Basile, also via their actions in continuing to negotiate the transactions as if they still agreed with the premise that they would sign the leak out, the transaction would be consummated before December 6, 2015 in time to avoid the lapse of the repayment period of the LG Note, and would still provide the new money funding.

104.     Each time Rx Safes attempted to back out, such as on November 29, 2015, and again on December 2, 2015, Hodson and Kodiak affirmatively represented that they still intended to continue with the whole transaction (not just the purchase of the LG Note), and acted consistently therewith by, *inter alia*, sending and circulating newly revised documents for signature—and even lying about having sent executed documents.

105.     Hodson and Kodiak never intended to follow through on their representations— they wanted to prevent Rx Safes from paying off the LG Note so that they could purchase it and

make a quick buck, knowing full well that Rx Safesalternatively intended to pay it off and prevent its conversion without a leak out agreement.

106.    Hodson and Kodiak thus made material omissions by hiding their true intentions that they never intended to follow through their proposed transaction terms, which caused Rx Safes to cease pursuing alternative funding opportunities to pay off or refinance the LG Note, and which they used, in turn, to surreptitiously acquire the LG Note, convert it, meanwhile reaping for themselves windfall profits.

107.    Upon information and belief, BMA was a core instrumentality and participant of this scheme by placing the wrongful orders, repeating and publishing the misstatements knowing they were incorrect and false, transmitting the incorrect 144 Opinion Letters, obtaining the converted shares, and selling them on the open market for a profit—all the while profiting itself.

108.    These misstatements and omissions were made in direct connection with the purchase of, and as a means to acquiring the LG Note, a security, and/or the underlying Rx Safes common shares.

109.    But-for the misrepresentations, Rx Safes would not have entered into the October Note and never would have reserved the shares for either the October Note, and would have paid off, refinanced or extended the LG Note, and Defendants would not have been able to acquire it, convert it or sell it or use the reserved shares for the October Note to convert the LG Note.

110.    The fraud and deceit directly injured Rx Safes and caused Rx Safes foreseeable injury in the form of lost opportunities to raise funds and loss of market value due to the disorderly issuance and subsequent trading of its shares.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**Against Kodiak**

111.    Plaintiff RxSafes incorporates the factual allegations set forth above as if fully set forth herein.

112.    On December 4, 2015, Defendants sent an email to RxSafes stating that the transaction documents had been executed, and requesting that they be countersigned and sent back in order for the entire transaction to be completed.

113.    Rx Safes contends that this constitutes an enforceable oral agreement, the terms of which are evidenced by an exchange of emails and final drafts of the documents.

114.    Defendant purchased the LG Note having agreed to do so on the condition that it would also make a $100,000 investment in Rx Safes, and purchase other aged debt subject to a leak out agreement.

115.    Defendant breached its agreement to provide $100,000 in new money to Rx Safes.

116.    Defendant breached its agreement with Rx Safes to purchase $250,000 of Rx Safes' aged debt subject to the leak out agreement.

117.    Defendant breached its agreement with Rx Safes when it sold the shares into the market recklessly and in direct contravention of the leak out agreement—which hurt Rx Safes' share price.

118.    The above cited of Defendant's breaches have cost Rx Safesmillions of dollars in damages.

119.    Assuming for the sake of argument that Defendant properly purchased the LG debt, it breached the Note terms by (i) seeking to convert the Note without duly presenting the Note for transfer to Rx Safes (thus, amending the Holder of record), and (ii) converting the

shares without providing notice to Rx Safes of the conversion.

### THIRD CAUSE OF ACTION
### FRAUD/FRAUDULENT INDUCEMENT
### Against Kodiak and Hodson

120.    Plaintiff RxSafes incorporates the factual allegations set forth above as if fully set forth herein.

121.    Hodson and Kodiak employed a scheme to defraud RxSafes, using the repeated promise and oral agreement to invest $100,000 in RxSafes and sign a leak out agreement if RxSafes would sell it the LG Note and other aged debt, whilst Kodiak and Hodson had no intention at any time to fulfill their promise.

122.    Hodson and Kodiak used an artifice to defraud RxSafes in the form of at least two emails – the first evincing a willingness to do a complete transaction whereby it would invest new money in Rx Safes, purchase $250,000 in aged debt including the LG Note and execute a leak out agreement limiting daily sales to no greater than $5,000.00 on which Rx Safes relied in not pursuing other avenues; and a second claiming to be the executed documents on December 4, 2015, on which Rx Safes relied in not directly paying off the LG Note while it figured out what was going on with Kodiak, and on which it relied in sending its authorizations to Island, and on which LG relied in selling the LG Note to Kodiak.

123.    Hodson and Kodiak made these affirmative representations verbally and via email to RxSafes' Lorraine Yarde and or Mark Basile, also via their actions in continuing to negotiate the transactions as if they still agreed with the premise that they would sign the leak out, the transaction would be consummated before December 6, 2015 in time to avoid the lapse of the repayment period of the LG Note, and would still provide the funding.

124.    Each time RxSafes attempted to back out, such as on November 29, 2015, and

again on December 2, 2015, Hodson and Kodiak affirmatively represented that they still intended to continue with the whole transaction (not just the purchase of the LG Note), and acted consistently therewith by, inter alia, sending and circulating documents for signature—and even lying about having sent executed documents.

125.   Hodson and Kodiak never intended to follow through on their representations—they wanted to prevent RxSafes from paying off the LG Note so that they could purchase it and make hundreds of thousands of dollars off of it, knowing full well that RxSafes intended to pay it off, refinance it or extend it and prevent its conversion without a leak out agreement.

126.   Hodson and Kodiak thus made material omissions by hiding their true intentions that they never intended to follow through their proposed transaction terms, which caused RxSafes to cease pursuing alternative funding opportunities to pay off or refinance the LG Note, and which they used, in turn, to surreptitiously acquire the LG Note, convert it, meanwhile reaping for themselves windfall profits.

127.   To cover up their scheme and effectuate the final step: liquidation for profit – Hodson and Kodiak never informed Rx Safes of the transfer and never sought to have Rx Safes change them to the holder of record, nor did they provide Rx Safes notice of their conversions as they are required to under the Note.

128.   Hodson and Kodiak knew apprising Rx Safes of the transfer or conversions would animate Rx Safes to intervene (as it did immediately after finding out what Kodiak was up to) to stop the conversion.

129.   These misstatements and omissions were made in direction connection with the purchase of, and as a means to acquiring the LG Note, a security, and/or the underlying RxSafes common shares.

130.    But for the misrepresentations, Rx Safes would have paid off or refinanced the LG Note, and Defendants would not have been able to acquire it, convert it or sell it.

131.    The fraud and deceit directly injured Rx Safes and caused Rx Safes foreseeable injury in the form of lost opportunities to raise funds and loss of market valuedue to the disorderly issuance and subsequent trading of its shares.

## FOURTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE
### Against Kodiak and Hodson

132.    Plaintiff RxSafes incorporates the factual allegations set forth above as if fully set forth herein and alleges that all conditions precedent needed to be satisfied have indeed been satisfied.

133.    RxSafes had an agreement in the form of the LG Note with LG Capital and separately with Island Stock Transfer, its transfer agent.

134.    Defendants knew of the LG Note and of the transfer agency with IST.

135.    Defendants knew that RxSafes intended to pay off the LG Note or refinance it before December 6, 2015, in order to avoid the lapse in the prepayment period and to avoid the shares from becoming convertible and freely tradable without a leak out agreement.

136.    Defendants committed fraud and in bad faith and otherwise unreasonably interfered with RxSafes' rights and ability to exercise its contractual prerogatives with the LG Note and with IST.

137.    Defendants proximately caused RxSafes to suffer injury and damages by taking the LG Note and converting it without the leak out agreement and causing IST to convert the shares in contravention of Rx Safes' instructions.

138.    But for Defendants' interference, RxSafes would not have suffered the damages.

## FIFTH CAUSE OF ACTION
## CONVERSION
### Against Kodiak and BMA Securities

139.   Plaintiff RxSafes incorporates the factual allegations set forth above as if fully set forth herein and alleges that all conditions precedent needed to be satisfied have indeed been satisfied.

140.   The shares Kodiak were issued pursuant to their conversion notices were so issued under false or fraudulent pretenses (as contended above in the First and Third Causes of Action, which are incorporated herein by reference).

141.   Additionally or alternatively, the LG Note was usurious and therefore void *ab inito* under New York law. Any conversion of shares under a void note constitutes conversion, entitling Rx Safes to replevin, damages and punitive damages.

142.   Additionally or alternatively, the entire LG Note, specifically the interest shares, had not fully seasoned prior to Kodiak seeking to convert the entire Note into common shares, and thus, these such shares remained restricted under Rule 144 and could not be issued under the Rule because no exemption applied.

143.   Additionally or alternatively, the shares Defendants attempted to, and did, take upon issuance were not reserved for it under the LG Note, they were the ones reserved and earmarked for the October Note.

144.   Additionally or alternatively, Defendants' conversion notices converting RxSafes' shares were in violation of RxSafes' contractual rights.

145.   RxSafes suffered actual damages and is entitled to replevin and return of the shares (or replevin), disgorgement of Defendants' ill-gotten profits, damages, restitution and punitive damages.

## SIXTH CAUSE OF ACTION
## MARKET MANIPULATION
### Against Kodiak, BMA Securities and Hodson

146.    Plaintiff RxSafes incorporates the factual allegations set forth above as if fully set forth herein and alleges that all conditions precedent needed to be satisfied have indeed been satisfied.

147.    Rx Safes further incorporates the acts of the First Cause of Action, as if fully set forth herein.

148.    Upon information and belief, Island issued Kodiak RxSafes common stock that allowed Kodiak to make a profit at the expense of RxSafes and its shareholders.

149.    Upon information and belief, Kodiak, via its broker dealer, BMA securities, shorted RxSafes' stock, or pre-sold the shares, causing the market for RxSafes to decline.

150.    The shares converted and transferred to Kodiak by Island were then used to cover the shorts, or otherwise were dumped into the market by Kodiak (upon information and belief), causing the market to decline precipitously in the days following the transfers—thus doing substantial damage to RxSafes' value (this is why the leak out agreement was so crucial) while reaping a windfall for Kodiak.

151.    Kodiak and BMA's trading activity injured RxSafes to the tune of hundreds of thousands of dollars, and causing over $5 million in lost valuation.

152.    Upon information and belief, Hodson at all times directed and coordinated all of Kodiak's and BMA's activities.

## SEVENTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### Against Island Stock Transfer

153.    Plaintiff Rx Safes incorporates the factual allegations set forth above as if fully set

forth herein and alleges that all conditions precedent needed to be satisfied have indeed been satisfied.

154.    Island owed RxSafes a duty of loyalty and a fiduciary duty to safeguard RxSafes' property and non-public confidential information entrusted to it.

155.    Island breached its fiduciary duty to Rx Safes by, on December 24, 2015, December 30, 2015, and January 4, 2016, executing conversion notices sent by Kodiak when the Note required that such notices also be sent to Rx Safes, and they had not been.

156.    Island breached its fiduciary duty to RxSafes by, on December 24, 2015, December 30, 2015, and January 4, 2016, executing conversion notices sent by Kodiak when the reservation of shares for the LG Note and the irrevocable grant of authority on the LG Note was as to conversion notices sent by *LG*, not by Kodiak.

157.    In addition, Island allowed Kodiak to convert shares from a pool of reserve shares assigned to a totally different transaction, which were not eligible for conversion under SEC Rules and the UCC.

158.    Island breached its fiduciary duty to RxSafes by executing the conversions knowing (whether actually or constructively), that the reserve shares were not properly seasoned under Rule 144 because the LG Note's interest, which was payable in shares, had not accrued for the full six months and thus was not properly freely tradable and ignored the fact when informed by Rx Safes that the Note would need to begin a new tacking period upon transfer and was therefore not yet eligible for conversion.

159.    Island breached its fiduciary duty to RxSafes by executing the conversions knowing that RxSafes was arguing that the transfer of the LG Note had been procured by fraud and bad faith, and was requesting the proper time to demonstrate same in a court of law.

160.    Island breached its fiduciary duty to RxSafes by executing the conversions having induced RxSafes into believing that it would hold off on the conversions for 30 days based on the company's "STOP ORDER" to IST, on the form provided by IST to the company, but then inexplicably executed the conversions just days after making that representation on which RxSafes relied.

161.    Island breached its fiduciary duty to RxSafes by executing the conversions knowing that Kodiak intended to sell the shares without a leak out agreement which Island had been made aware by RxSafes had been promised to it by Kodiak, but never delivered.

162.    Island breached its fiduciary duty to RxSafes by executing the conversions knowing that the substitution letter had been procured through fraud, had been withdrawn on that basis (e.g., it was void), and Island had acknowledged same prior to executing the conversions.

163.    Island breached its fiduciary duty to RxSafes by executing the conversions knowing that it had already informed RxSafes of its resignation as RxSafes transfer agent,was refusing to conduct other TA responsibilities requested by Rx Safes during the required 10 day notice period, yet continued to execute the transfers to Kodiak without proper authority,

164.    Island breached its fiduciary duty to Rx Safes by providing non-public information to a non-qualified shareholder of Rx Safes (who was not an affiliate and had not held shares for over 6 months pursuant to Nevada NRS 78.105) relating to an increased number of shares issued and outstanding since Rx Safes last public filing, providing such shareholder inside information, which he then posted on a public message board, the information upon which he and other shareholders of Rx Safes may have acted in trading shares of Rx Safes based on their knowledge of non-public information.

165.    Island's breaches of fiduciary duty caused Rx Safesharm and injuries in the form

of actual damages, loss of valuable property, decrease in value, and out of pocket expenses, entitling Rx Safes to actual damages, restitution, replevin, and punitive damages and attorneys fees all in excess of $5,000,000.00

## EIGHTH CAUSE OF ACTION
## BREACH OF CONTRACT
### Against Island Stock Transfer

166.   Plaintiff RxSafes incorporates the factual allegations set forth above as if fully set forth herein and alleges that all conditions precedent needed to be satisfied have indeed been satisfied.

167.   The contract between Island and RxSafes provides for RxSafes to indemnify Island in the event RxSafes instructs Island not to comply with a conversion notice which RxSafes has challenged as being *ultra vires*.

168.   Island also owed RxSafes a contractual duty of good faith and fair dealing which was breached as well as their contractual duties.

169.   The Uniform Commercial Code states that a transfer agent is not to execute a transfer request, even if under an irrevocable order, when it is aware of a disputed interest.

170.   Island breached its contract with RxSafes by executing the conversion notices sent by Kodiak knowing that it lacked the authorized shares to issue, that the shares were not seasoned or exempt under Rule 144 and that Rx Safes indicated to Island that such shares had been obtained fraudulently.

171.   Island breached its contract with RxSafes by, on December 24, 2015, December 30, 2015 and January 4, 2016 executing conversion notices sent by Kodiak when the reservation of shares for the LG Note and the irrevocable grant of authority on the LG Note was as to conversion notices sent by *LG*, not by Kodiak and that any instruction by Rx Safes to allow such

conversions had been rescinded by Rx Safes.

172.    Island breached its contract with RxSafes by executing the conversions knowing (whether actually or constructively), that the shares were not properly seasoned under Rule 144 because the LG Note's interest, which was payable in shares, had not accrued for the full six months and thus was not properly freely tradableand ignored the fact that such portion of the Note was not eligible for conversion.

173.    Island breached its contract with RxSafes by executing the conversions knowing that RxSafes was arguing that the transfer of the LG Note had been procured by fraud and bad faith, and was requesting the proper time to demonstrate same in a court of law.

174.    Island breached its contract with RxSafes by executing the conversions having induced RxSafes into believing that it would hold off on the conversions for 30 days, but then inexplicably executed the conversions just days after making that representation on which RxSafes relied.

175.    Island breached its contract with RxSafes by executing the conversions knowing that Kodiak intended to sell the shares without a leak out agreement which Island had been made aware by RxSafes had been promised to it by Kodiak, but never delivered.

176.    Island breached its contract with RxSafes by executing the conversions knowing that the substitution letter had been procured through fraud, had been withdrawn on that basis (e.g., it was void), and Island had acknowledged same prior to executing the conversions.

177.    Island breached its contract with RxSafes by executing the conversions knowing that it had already informed RxSafes of its resignation as RxSafes transfer agent, was refusing to conduct other TA responsibilities requested by Rx Safes during the required 10 day notice period, yet continued to execute the transfers to Kodiak without proper authority.

178.   Island breached its contract with Rx Safes by providing non-public information to a non-qualified shareholder of Rx Safes (who was not an affiliate and had not held shares for over 6 months pursuant to Nevada NRS 78.105) relating to an increased number of shares issued and outstanding since Rx Safes last public filing, providing such shareholder inside information, which he then posted on a public message board, the information upon which he and other shareholders of Rx Safes may have acted in trading shares of Rx Safes based on their knowledge of non-public information.

179.   Island's breaches of contract caused RxSafes harm and injuries in the form of actual damages, loss of valuable property, decrease in value, and out of pocket expenses, entitling Rx Safes to actual damages, restitution, replevin, and attorneys fees exceeding $5,000,000.

## VI.

## <u>DEFENDANT'S LIABILITY</u>

180.   Plaintiff RxSafes incorporates the factual allegations set forth above as if fully set forth herein.

181.   Rx Safes is entitled to punitive damages because defendantsexhibited willful, wanton and gross negligence, grossfraud, dishonest, and wrong-doing that the public has a clear interest in deterring in the future.

182.   Defendant's motives were purely greedy and reprehensible, showing no regard at all for the well-being of a young business, its employees and other shareholders.

183.   Defendants Kodiak, BMA and Hodson are jointly and severally liable because Defendants' actions were intentional and collusive, and they are jointly and severally liable for IST's liabilities as well because they caused and wrongfully interfered with that contract.

## VII.

## <u>PRAYER FOR RELIEF</u>

184.    Plaintiff RxSafes incorporates the factual allegations set forth above as if fully set forth herein and alleges that all conditions precedent needed to be satisfied have indeed been satisfied.

185.    Based upon the foregoing factual allegations Plaintiff Rx Safes respectfully asks this Court for judgment and an Order awarding Rx Safes actual damages, punitive damages, return of the shares unlawfully converted, restitution, disgorgement, and attorneys' fees and costs in an amount not less than $5 million,and for an order enjoining or cancelling enforcement of the October Note, and for all other such equitable and legal relief to which this Court deems Rx Safes entitled under the law and facts presented.

## VIII.

## <u>DEMAND FOR JURY TRIAL</u>

186.    Rx Safes demands trial by jury for all matters so triable to a jury.

Respectfully filed this 5th day of April, 2016.

**Friedman & Feiger LLP**

_____

Mazin A. Sbaiti, Esq.
Texas Bar No. 24058096
5301 Spring Valley Road
Suite 200
Dallas, Texas 75254
T: (972) 788-1400
F: (972) 716-6235
E: Mazin@FFLawOffice.com
***Counsel for the Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that the foregoing instrument was served via electronic copy on counsel listed in the Court's electronic directory to receive service via electronic filing of this instrument, on this the 20th day of April, 2016.

_____
Mazin A. Sbaiti, Esq.
***Counsel for the Plaintiff***